UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

DELICE MANON,                                  :
                                               :
                          Plaintiff,           :
                                               :
                                               :        12-CV-7360 (VEC)
            -against-                          :
                                               :        OPINION & ORDER
EUGENE PONS, DAVID EMERT, PANSY               :
MULLINGS, RAYMOND SCANLON, and                :
DAVID YASSKY, in their individual and official :
capacities, and CITY OF NEW YORK,             :
                                               :
                          Defendants.          :
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   9/18/2015
```

VALERIE CAPRONI, United States District Judge:

        Plaintiff Delice Manon initiated this action, pursuant to 42 U.S.C. §§ 1983, 1985, 1986,

1988 and various state laws, against several officials and former officials of the New York City

Taxi & Limousine Commission ("TLC") and the City of New York.  She alleges that Defendants

retaliated against her for the exercise of her First Amendment rights, violated her equal

protection and substantive due process rights, conspired to violate her constitutional rights, and

violated a number of state statutes.  Manon also claims that the City of New York adopted a

policy or practice that operated to deprive her of her First Amendment rights.  Defendants move

for summary judgment as to all of Manon's claims.[1]  For the following reasons, Defendants'

motion is GRANTED as to Manon's First Amendment, equal protection, federal conspiracy, and

official capacity state law claims, and DENIED as to Manon's substantive due process and

individual capacity state law claims.

_____

[1]        Defendants' Notice of Motion alleged that Defendants would move for an order "dismissing all claims in
this action."  Defendants' brief does not, however, address Manon's substantive due process claim.

## BACKGROUND

Delice Manon, a clerical associate at the TLC,[2] is a complainer.  From 2007 through 2012, Manon filed at least 12 written reports (on an internal TLC form designated a "General Report") complaining about TLC's Woodside facility.  Pl. 56.1 Opp.[3] ¶¶ 1-2, 5.[4]  Her complaints ranged from poor ventilation and a lack of cleanliness to her colleagues' poor manners and the inoperability of the surveillance cameras near the facility.  *Id.*; *see* Anci Decl. Exs. I-T.

Manon's complaints were not limited to General Reports – she sent many complaining emails to her supervisors.   Anci Decl. Exs. U-CC; Pl. 56.1 Opp. ¶ 7.  Although Manon's complaints may have been read, they rarely elicited a response.  Manon Dep. at 51.  Manon made sure to include TLC leadership – including the Deputy Commissioner, five levels of supervision above her – on "all" of her complaints.  *Id.* at 68.

Many of Manon's complaints, which were frequently detailed and contained tangents, were trivial.  *See, e.g.*, Anci Decl. Ex. I at 2 (complaining about "filthy pieces of rug"); *id.* Ex. J at 1 (complaining that Pons was late in shuttling Manon from the worksite to the subway); *id.*

---

[2]      Manon has worked at the TLC since 1993 (although she has been on disability leave since 2012), Plaintiff's Local Rule 56.1 Statement of Disputed [sic] Material Facts ("Pl. 56.1 Opp.") ¶¶ 1-2, Cooper Dep. at 43, Manon claims that she was "wrongfully transferred" from the TLC's Long Island City facility to the Woodside facility in 1999, Third Am. Compl. ¶ 14; *but see* Pl. 56.1 Opp. ¶ 3.  In 2006, Manon was transferred to the Enforcement Unit, *id.*, where she worked at all times relevant to this action.

[3]      The parties' statements of undisputed material facts pursuant to Local Rule 56.1 are referred to as "[Party] 56.1" and their responses are "[Party] 56.1 Opp."

[4]      Manon's complaints actually began prior to her being transferred to the Enforcement Unit in 2006.  *See, e.g.*, Milner Decl. Ex. E (complaining that, after Manon confronted her supervisor about a remark about her clothing that she found distasteful, he began treat her differently); *see also* Manon Dep. at 50-51 (clarifying that the offensive remark was that Manon's "two-piece suit . . . looks good on [her]"); *id.* at 37 (explaining that Manon turned down a promotion in 2000 "[b]ecause [she] didn't have respect for the administration [and] the way they conducted their business and [she] thought it was improper and it was inappropriate and disrespectful the way they just promoted whoever they wanted"); *id.* at 48-49 (Manon had filed a number of complaints related to her male coworkers' use of profanity and sexist comments); *id.* at 54 (when she worked at the TLC's Long Island City office, Manon complained about her female coworkers' aggressive postures towards her and the customers, which Manon said put her safety in jeopardy).  Her complaining is not, apparently, restricted to the office.  *See id.* at 21 (complaining about noisiness during the deposition itself).  The Court focuses on Manon's complaints during her time in the Enforcement Unit.

Ex. K at 1 (same); *id.* Ex. N at 2 (complaining that the fans installed to respond to her prior

ventilation-related complaints "blow[] hot air and that is no relief"); *id.* Ex. P (a supervisor,

Emert, rudely interrupted her); *id.* Ex. Y (the shuttle had an unpleasant odor).  Manon frequently

engaged in hyperbole to describe the seriousness of the conditions about which she complained –

the air quality, for example, was described as "a health issue for all of us," *id.* Ex. I at 1, that

transformed the office into "a death trap" and a "rat hole," *id.* at 2.  She complained that there

was only "one exit," constituting a fire hazard (and also a "death trap," *see id.* Exs. O, Q), and

that the non-working video surveillance cameras presented a "great safety issue," *id.* Ex. R.

When the janitor did not do a good job for one day, Manon wrote that he created "a hazardous

condition in the work environment as well as a health issue."  *Id.* Ex. U.

 Manon complained about the facility to the New York State Department of Labor Office

of Safety and Health's Public Employee Safety & Health ("PESH") unit.  The first complaint

informed PESH that:

> The ventilation in my work area is not working, I asked HR David Emery to turn
> on the vent due to the fact that it is very poor air quality in the work area and very
> warm.  He informed me that the vent is not working.  I have been working in the
> Notice Enforcement Unit since 2006 and [e]very year around the time warm
> weather comes around I complain about the poor air quality and not a thing is done
> about it by the Administration expect [sic] adding more fans in the work area.  [The]
> Administration fails to realize that after a while it blows hot air and that is no relief.
> I am also having an issue with the layout of my work unit.  It's a close[d] box with
> only one exit, in case of a fire.  I am in a death trap.  I do feel very unsafe and realize
> that this Administration is putting my life and health in danger.  This
> Administration enforces the law of safety but does not apply it for the safety of the
> employees.  Attach[ed] are copies of my most recent complain[t]s addressed to the
> employer.  There are more complain[t]s dating back to 2008.

*Id.* Ex. W.  PESH did not respond to that complaint; Manon followed up with a second

complaint, attaching her first and noting additional concerns:

> A dirty, filthy ladies bathroom is a health hazard[].  Since the new cleaning crew
> started[,] the Ladies bathroom floor has not been mop[ped], the sinks and toilet
> bowls are filthy and dirty tissues [are] on the floor.  I don't understand why the new

cleaning crew can't clean the Ladies bathroom, or why [the] Administration is unable to deal with the health hazards issue.

*Id.* Ex. CC.  At some point – the record does not reflect when – PESH inspected the TLC facility. *See* Emert Dep. at 15-16.  The inspectors reported that the air quality was surprisingly good in light of the facility's proximity to the Brooklyn-Queens Expressway and did not pose a health hazard.  *Id.* at 16.

Perhaps the most persistent complaint that Manon advanced was her concern about the shuttle service that the TLC provided to employees at the Woodside location, which was otherwise inaccessible to mass transit.  The informal service operated to pick up and drop off employees at the nearest subway station.  *Id.* at 35.  The service was simply a van, *id.* at 39, driven by whatever facilities department employee was available, *id.* at 36.  Although there was a schedule, Pl. 56.1 Opp. ¶ 13, the pickup and drop-offs times depended on when the Woodside employees began and ended their shifts, Emert Dep. at 34, and the shuttle operators would sometimes accommodate employees' requests to leave earlier or later than scheduled, *id.* at 34-35.

The shuttle service was overseen by Defendant David Emert, the Director of Fleet and Facility Management.  Cooper Dep. at 23.  Emert also oversaw repairs and maintenance on 116 vehicles and the maintenance of the TLC's Woodside facility.  Emert Dep. at 6-7.  When employees complained to TLC leadership about the shuttle or the facility, the complaints would ultimately reach Emert – sometimes through Defendant Pansy Mullings, then a Deputy TLC Commissioner.  *Id.* at 32.  Manon also complained directly to Emert, who testified that he "didn't have a problem" with her complaints.  *Id.* at 43.  Many of Manon's complaints to Emert concerned one of Emert's subordinates, Defendant Eugene Pons, whom she described as "rude," "loud," "cursing," and "obnoxious at times."  *Id.* at 44.

4

Pons, who was a supervisor of stock workers typically assigned to the evening shift at the Woodside TLC facility, testified that Manon "was his enemy." Defs. 56.1 Opp. ¶¶ 47-49. Manon, for her part, alleges that Pons was a sexist who once said that women "didn't belong in the workplace, they should be home having babies, taking care of the family." Manon Dep. at 83. The two had a number of run-ins, frequently concerning the shuttle. Manon testified that Pons drove the shuttle van into oncoming traffic, *id.* at 85, regularly failed to clean the van, and was chronically late. Manon alleges that her problems with Pons were a vicious cycle in which Pons responded to Manon's complaints with deliberately bad behavior, prompting more complaints. Pl. 56.1 Opp. ¶¶ 1, 12.

Manon alleges four specific serious incidents involving Pons. First, in the summer of 2010, Manon discovered that certain of the plants that she kept by her desk had died. Pl. 56.1 Opp. ¶ 31. Believing their death to be suspicious, Manon and two colleagues sniffed the deceased plants and smelled what they believed to be ammonia. Manon Dep. at 86. Emert's department – and, on the overnight shift, Pons in particular – had access to the facility's cleaning supplies. Emert Dep. at 26. Based on his motive and opportunity, Manon suspected Pons of killing her plants. Manon Dep. at 86-87. Pons denies involvement in the incident and asserts that he "never went into [Manon's] work area." Pons Dep. at 36.

The second incident arose in November 2010, when Manon planned to leave work early. Her supervisors had arranged for the shuttle to make an early run to accommodate her; when the shuttle was a few minutes late, she knocked on Emert's door to ask about the driver. Manon Dep. at 90. Emert was engrossed in a "very intense" meeting in his office, so he asked her to come back in a few minutes. Emert Dep. at 52-54. "Pons[, who was in Emert's office,] closed the door quickly and with some force such that it made contact with respondent's nose." *Taxi & Limousine Comm'n v. Manon*, OATH Index No. 735/12 (Jan. 20, 2012) (Spooner, ALJ) ("ALJ

5

Opinion"), Anci Decl. Ex. FF, at 5.[5]  Manon yelled at Pons, calling him an "animal" and offering

to "go outside" to fight.  Pl. 56.1 Opp. ¶¶ 17-19.  A number of TLC employees heard or

witnessed some of the drama.  ALJ Opinion at 4.

Although Manon wanted to file a police report against Pons, Deputy Commissioner

Mullings recommended that she adhere to standard TLC protocol, permitting the agency to

conduct an internal investigation.  Manon Dep. at 93.  Manon acquiesced and the TLC referred

the incident for investigation; its investigator ultimately recommended that Manon and Pons be

disciplined, although Pons was subject to a longer suspension.  Anci Decl. Exs. EE at 1, JJ.

Manon was charged with yelling at and threatening Pons; she grieved the recommendation and

the Administrative Law Judge recommended that the charges against her be dismissed.  ALJ

Opinion at 1.  After reviewing the record, Defendant and then-TLC Commissioner David Yassky

adopted the Administrative Law Judge's findings of fact but asserted that Manon's disrespectful

comments merited some punishment; accordingly, Yassky imposed a one-day suspension.  Anci

Decl. Ex. GG at 2-3.

Manon appealed Yassky's decision to the City Civil Service Commission, which reversed

the Commissioner's determination and wrote that Manon's "behavior was a sudden response to

being struck in the face, and as such cannot be classified as misconduct."   Anci Decl. Ex. HH at

D31.  Although Manon called Pons an "animal," the Commission found that her remark was "an

excited utterance" that did not justify a suspension; accordingly, on July 25, 2012, it ordered that

Manon be reimbursed for her one-day suspension.  *Id.*

---

[5]     The parties sharply dispute the facts surrounding this incident.  To the extent that there is an administrative
determination regarding the dispute, such a determination is given preclusive effect.  *Burkybile v. Bd. of Educ. of
Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 312 (2d Cir. 2005).  Unresolved factual disputes are
taken in the light most favorable to Manon at this stage.  *Rogoz v. City of Hartford*, 796 F.3d 236, 250 (2d Cir.
2015).

The third incident occurred in August 2012 when Manon had another physical run-in with Pons.  The two were entering and exiting the facility and, according to Manon, Pons "plowed into her."  Pl. 56.1 Opp. ¶ 44.  Pons' description of the incident was that they walked past each other.  *Id.*  Manon called the police, and after some investigation, the police arrested Pons (although charges were ultimately adjourned in contemplation of dismissal).  Pons Dep. at 58.  After the incident, Manon left work and has been receiving Workers' Compensation since that time based on injuries allegedly sustained in the incident.  Third Am. Compl. ("TAC") ¶ 54, Cooper Dep. at 43.

Not long after Manon left on workers' compensation leave, the fourth incident occurred.  In September 2012, a Deputy Director in Manon's chain of command discovered that several personal photographs on Manon's desk had been defaced.  Cooper Dep. at 30, Milner Decl. Ex. B.  Manon accused Pons of defacing her photographs, although Manon neither saw nor learned additional evidence suggesting that Pons was the culprit.  For his part, Pons denies defacing the photographs.  Pl. 56.1 Opp. ¶¶ 39-43.

In September 2012, Manon initiated this action *pro se*.  She later obtained an attorney who filed the operative Third Amended Complaint, bringing myriad federal constitutional and state tort law claims.  Defendants moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal

quotation marks omitted)).  The Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (*per curiam*) (quotation marks and citation omitted).  Nevertheless, "to defeat summary judgment, 'a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'"  *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 197 n.10 (2d Cir. 2014) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)).

## I.   Federal Claims

### A.  First Amendment Retaliation

Manon alleges that Defendants retaliated for her exercise of her First Amendment rights. To prevail on a First Amendment retaliation claim, Manon "must establish that: '(1) [her] speech or conduct was protected by the First Amendment; (2) the defendant[s] took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech.'"  *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).  Manon points to no evidence from which a reasonable juror could conclude that any of her protected speech led to an adverse action; accordingly, Defendants are entitled to summary judgment as to Manon's First Amendment claims.

### 1.  Some of Manon's Speech Was Arguably Protected by the First Amendment

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Lane v. Franks*, 573 U.S. ---, ---, 134 S. Ct. 2369, 2377 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  "The 'First Amendment

protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.'" *Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). "After all, public employees do not renounce their citizenship when they accept employment." *Lane*, 134 S. Ct. at 2377. Courts conduct "a two-step inquiry into whether a public employee's speech is entitled to protection." *Id.* at 2378. "'The first requires determining whether the employee spoke as a citizen on a matter of public concern.'" *Matthews*, 779 F.3d at 172 (quoting *Garcetti*, 547 U.S. at 418). If she did, the Court "must 'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Castine v. Zurlo*, 756 F.3d 171, 175 (2d Cir. 2014) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Some, but not all, of Manon's speech arguably related to a "matter of public concern" and could arguably be considered speech as a public citizen; the State had no reasonable interest in discouraging such speech. Accordingly, some of Manon's speech is arguably subject to the First Amendment's protection.

> ### a. Speech as a Public Citizen on a Matter of Public Concern

Whether Manon's speech *could* be protected is subject to a two-part inquiry: the Court must first determine whether the subject of her speech was a matter of public concern and, if so, whether she spoke as a citizen or as an employee. *Matthews*, 779 F.3d at 172 (citing *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011)). Manon argues that all of her complaints are protected speech; indeed, much of Manon's briefing assumes that if Manon's speech was not made pursuant to her official responsibilities, then it was "protected" for First Amendment purposes. *See* Pl. Opp. at 4 -6. Manon's arguments appear to rely on the misapprehension that satisfying *either* the "matter of public concern" *or* the "as a citizen" prong establishes that speech is

protected by the First Amendment.  In fact, a plaintiff must adduce evidence of both.  *See*

*Matthews*, 779 F.3d at 172.  That rule prevents absurd results.  For example, if a State employee

complained that the egg sandwich he purchased in the office's cafeteria was made on a kaiser

roll instead of an English muffin, such a complaint would fall outside of his job responsibilities

but would not be protected by the First Amendment because it did not touch on a matter of

public concern.  If the State fired its employee for complaining about the kaiser roll, it might be

making a poor employment decision, but it would not be implicating the concerns of state

tyranny against which the First Amendment guards.

Many of Manon's complaints are of the egg-sandwich variety and are therefore easily

dismissed.  Complaints that the complimentary shuttle frequently ran late, for example, are not

the sort of critiques of State action protected by the Bill of Rights.  Similarly, complaints that

Manon's colleagues were behaving discourteously, that the temperature in the facility was too

hot or too cold, that the ladies' restroom and the facility generally were not adequately cleaned,

and that the external video cameras were not operational do not constitute matters of public

concern.  *Cf. Nagle v. Marron*, 663 F.3d 100, 107-08 (2d Cir. 2011) (a teacher's accusation that

an assistant principal forged her signature was not a matter of public concern); *Pekowsky v.

Yonkers Bd. of Educ.*, 23 F. Supp. 3d 269, 276-77 (S.D.N.Y. 2014) ("A 'matter of public

concern' is one that 'relates to any matter of political, social, or other concern to the

community.'") (quoting *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013)).

Although it is a close call, the Court assumes, for purposes of this motion that the balance

of Manon's complaints rise to the level of matters of public concern.  Manon complained about

the fact that her work site had only one exit, posing a substantial risk to safety if there were a

fire;[6] the air quality in the facility, which she claimed was a health hazard; and Pons's reckless

driving.  Pl. 56.1 Opp. ¶ 5; Manon Dep. at 84.  The public has an interest in ensuring that

workplaces (both public and private) do not pose health and safety hazards to their workers and

that vehicles driven on public roads do not endanger the lives of the occupants or other vehicles.[7]

*Cf. Magilton v. Tocco*, 379 F. Supp. 2d 495, 500 (S.D.N.Y. 2005) (assuming that an employee's

complaints to PESH regarding his State employer's poor workplace safety practices were a

matter of public concern and triggered First Amendment protections).

Manon was also arguably speaking as a public citizen and not as an employee.  The line

between the dual roles of the public employee may be thin at times, but when an employee's

speech concerns matters that extend beyond her ability to perform her functions on a day-to-day

basis into the realm of how the agency of which she is a part should be run, the employee's

speech is frequently protected by the First Amendment.  *Compare Matthews*, 779 F.3d at 174 (an

officer's complaints about a ticket quota system extended beyond the officer's limited role and

was therefore protected) *and Lane*, 134 S. Ct. at 2379-80 (an official's testimony in court

pursuant to a subpoena was speech as a citizen), *with Weintraub v. Bd. of Educ. of City Sch. Dist.

of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010) (a teacher's grievance regarding the school

administration's refusal to discipline a particular child in the teacher's classroom concerned the

day-to-day business of the school and was therefore not made "as a citizen"), *and Garcetti*, 547

---

[6]        The Third Amended Complaint does not appear to allege that Manon complained about the absence of
sufficient fire exits.  The pleading does, however, allege that Manon complained about "unsafe working conditions."
*See* TAC ¶¶ 88, 123.  Because Defendants were on notice of the substance of Manon's complaints, the Court
assumes that these complaints may be considered part of Manon's alleged "protected activity" in this action.

[7]        Although Manon's intent in complaining was likely to alter the day-to-day conditions of her employment
and not to guard against State misconduct (or to preserve the taxpayers' money in the event of a disaster, as she now
argues), "'[t]he speaker's motive is a factor to consider but 'is not dispositive in determining whether his or her
speech addresses a matter of public concern.'"  *Golodner*, 770 F.3d at 202 (quoting *Sousa v. Roque*, 578 F.3d 164,
173 (2d Cir. 2009)).  "'[W]hether an employee's speech addresses a matter of public concern must be determined by
the content, form, and context of a given statement, as revealed by the whole record.'"  *Id.* (quoting *Connick v.
Myers*, 461 U.S. 138, 147-48 (1983)).

U.S. at 422 (preparation of a disposition memorandum by a prosecutor was part of the day-to-day work of the prosecutor and was therefore not made "as a citizen").  "[W]hen a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." *Matthews*, 779 F.3d at 174.  Manon's speech was clearly outside of the purview of her responsibilities and arguably concerned policy matters; accordingly, she was speaking "as a citizen."

### b. *Pickering* Analysis

If a public employee speaks as a citizen on a matter of public concern, whether her speech is protected by the First Amendment depends on "the *Pickering* analysis: whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'"  *Id.* at 172 (quoting *Lane*, 134 S. Ct. at 2380); *see Pickering*, 391 U.S. at 568.  In conducting that analysis, courts look to whether an employer could reasonably predict that the speech would cause a disruption serious enough to outweigh the value of the speech and whether the potential disruption was the motivation of the adverse action.  *Castine*, 756 F.3d at 175 (citing *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011)).  Aside from Manon's personal criticisms of Pons, which were not made as a citizen on a matter of public concern, Manon's speech had no potential to be disruptive.  Accordingly, insofar as she spoke as a citizen on a matter of public concern, Manon's speech was protected by the First Amendment.

### 2. Defendants Allegedly Took an Adverse Action against Manon

Next, the parties dispute whether any of the actions taken against Manon constitute "adverse actions" for the purpose of her First Amendment retaliation claim.  "To prove a First

Amendment retaliation claim, a plaintiff must establish an adverse employment action that would 'deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Pekowsky*, 23 F. Supp. 3d at 278 (quoting *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012)).  "Under this 'objective' standard, an adverse action must be more than 'de minimis' to support a First Amendment retaliation claim."  *Cox*, 654 F.3d at 273 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006)).  "The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying."  *Wrobel*, 692 F.3d at 31.  Although "it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise," *Zelnik*, 464 F.3d at 226 (quotation marks, citation, and alteration omitted)), "'context matters,' as some actions may take on more or less significance depending on the context,'" *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011)).[8]

Defendants assert that "the vast majority" of incidents about which Manon complains do not constitute adverse actions for First Amendment retaliation purposes, but they do not identify the specific adverse actions that they believe are too trivial to qualify.  Defs. Mem. at 11.  Manon, for her part, identifies as adverse actions her one-day suspension, the incident in which

---

[8]      The standard for an "adverse action" in the context of First Amendment retaliation is substantially similar to the same inquiry in the Title VII retaliation context.  *Zelnik*, 484 F.3d at 227 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

Pons body-checked her,[9] Pons's general harassment, and Defendants' "failure to protect Ms. Manon from Pons' harassment and assault."  Pl. Opp. at 11.[10]

Manon's short suspension is on the boundary of decisions that are serious enough to dissuade a reasonable person from exercising her First Amendment rights.  *Cf. Faul v. Potter*, 355 F. App'x 527, 529-30 (2d Cir. Dec. 9, 2009) (summary order) (collecting cases).  Whether Manon's suspension constituted a serious adverse action depends on facts not before the Court at this stage – for example, the extent to which the suspension might influence future evaluations or future advancements within the TLC, the stigma associated with suspensions in the TLC, and the dissemination of Yassky's opinion describing Manon's misconduct.  Although the fact that the suspension was later overturned is relevant to the inquiry, it is not dispositive – the Second Circuit has held that where a plaintiff "may have at least suffered the loss of the use of her wages for a time[,] [t]his would be sufficient to support a jury's finding that she suffered an adverse [] action."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001).

The physical assault that Manon describes – during which Pons allegedly ran full-throttle into her, causing significant injury – would be sufficient to dissuade a reasonable person from exercising her First Amendment rights.  Crediting Manon's characterizations of Pons's attack and her injuries, the unprovoked assault led to significant and permanent physical damage; this is a consequence that would chill even a stout-hearted employee from expressing her views freely.

---

[9]     Defendants do not challenge whether any of the alleged actions occurred "under color of state law," as required to establish liability under 42 U.S.C. § 1983.  *See* 5 Leonard B. Sand et al., *Modern Federal Jury Instructions: Civil*, Instr. 87-69.

[10]    Insofar as Manon's complaint alleged other adverse actions, the Court deems them to be abandoned to the extent that she did not mention them when briefing this issue.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

Pons's general harassment of Manon, coupled with the Administration's failure to take action against him, rises to the level of "a critical mass of minor incidents [that] support a claim for retaliation." *Wrobel*, 692 F.3d at 32 n.2. Even if every incident allegedly ascribable to Pons is not enough, in itself, to constitute an "adverse action," taken together the troubling harassment that Manon alleges would dissuade a person of reasonable firmness from voicing her complaints. Pons allegedly killed Manon's plant, defaced pictures of Manon's family, and regularly accosted her; he viewed her as his "enemy" and took steps to "battle" her. The possibility of incurring active enmity at the office with physical manifestations would deter many individuals from freely exercising their First Amendment rights. The threat might not be as significant if the prospective speaker knew that any office enemy would be punished for any serious transgressions; here, however, Manon has adduced enough evidence to create a question of fact whether Pons was able seriously to harass her with impunity. If a jury were to credit that evidence, it would be sufficient to establish an adverse action.

### 3. Manon Has Adduced No Evidence of a Causal Connection between Manon's Protected Speech and the Adverse Action Taken against Her

To prevail on her claim for retaliation, Manon must establish a causal link between her protected activity and any adverse action. *Cf. id.* at 32. "'To establish causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse [] action.'" *Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 367 (E.D.N.Y. 2014) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." *Wrobel*, 692 F.3d at 32. "A retaliation claim will lie even where 'the measures taken by defendants were otherwise justified,' so long as plaintiff can prove that

15

retaliation was a 'motivating factor.'" *Pekowsky*, 23 F. Supp. 3d at 279 (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)).

There is no direct evidence of retaliatory animus in this case. *Cf. Smith*, 776 F.3d at 121. Manon bases her argument on four facts – (1) Defendants knew about Pons's harassment and did not help her; (2) Mullings discouraged her from filing a police report regarding the door-slamming incident; (3) the allegedly close temporal proximity between Manon's complaints and the adverse actions; and (4) Yassky's attempt to suspend Manon for one day. Pl. Opp. at 12-14. Even taken together, these facts do not support an inference that any adverse action was retaliation for any of Manon's protected speech.[11]

The first and fourth facts do not support an inference that any adverse actions were related to Manon's protected activity – they are simply recitations of some of the behavior that Manon characterizes as "adverse." The record reflects, as Manon asserts, that Defendants knew of her tension with Pons,[12] and when confronted with a specific action – the door slamming incident – the TLC suspended him for ten days. Pl. 56.1 Opp. ¶ 30. Manon might wish that Defendants had punished Pons more consistently and more severely, but there is no evidence in the record linking Pons's punishment – light, severe, or non-existent – to Manon's protected activity. Similarly, Yassky's attempt to suspend Manon *is* the main adverse action about which Manon complains; it does not on its face tend to suggest that Yassky wanted to suspend her because of her complaints about air quality, lack of fire exits, or the reckless driving of the shuttle. *Cf. Smith*, 776 F.3d at 121-22

---

[11]     The Court assumes, for this motion, that all Defendants were aware of Manon's grievances and other protected activity.

[12]     For example, Yassky testified that, before he suspended Manon, he "was aware" of an ongoing "conflict between Delice [Manon] and another employee [Pons]." Yassky Dep. at 10. Yassky confirmed that Scanlon, and perhaps Mullings, were also aware of the bad blood between the two employees. *Id.* at 10-11.

Deputy Commissioner Mullings's efforts to discourage Manon from filing a police report regarding the door-slamming incident also does not tend to suggest that Manon's protected activity was linked to any adverse action taken against Manon.  Manon did not file a police report, allegedly based on her understanding from Mullings that TLC would "do an in-house investigation" of the incident.  Manon Dep. at 93.  That investigation occurred and ultimately led to Pons's being suspended for 10 days.  Pl. 56.1 Opp. ¶ 30.  Moreover, because Manon did as she was asked and did not report the incident, no juror could infer that Defendants might have been unhappy that she exercised her rights to take the issue outside of the TLC's chain of command.  Accordingly, Mullings's request that Manon adhere to TLC's standard procedures does not support an inference of causality between protected activity and adverse actions.

Manon also relies on the alleged temporal proximity of her complaints to the adverse actions taken against her.  "A 'plaintiff can establish a causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse [] action.'"  *Nagle*, 663 F.3d 100, 110 (2d Cir. 2011) (quoting *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (alterations and internal quotation marks omitted)).  The inference of a causal link between protected activity and adverse actions is stronger when the two occur closer together, although "'[n]o bright line defines the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'"  *Cioffi*, 444 F.3d at 168 (quoting *Gorman-Bakos*, 252 F.3d at 554) (alterations omitted).

In this case, Manon's protected activity began at the latest with her April 12, 2007, complaint regarding air quality and general uncleanliness of the Woodside facility.  Anci Decl. Ex. I.  This one complaint seemingly opened a floodgate, Pl 56.1 Opp. ¶ 7, but none of the myriad other complaints that Manon produced resulted in any alleged adverse action for years.

17

Manon argues that one of her many complaints preceded by only two months Commissioner Yassky's decision to suspend her.  Pl. Opp. at 10.  While that may be true, there was rarely a time that the TLC could have taken action against Manon that would *not* have been recently preceded by some complaint that she believes is subject to First Amendment protection.  Public employees cannot inoculate themselves against adverse actions by engaging in a steady stream of protected activity.  *Kamholtz v. Yates Cnty.*, 800 F. Supp. 2d 462, 465 (W.D.N.Y. 2011) ("A public-employee plaintiff cannot simply comb through everything that [s]he has done or said publicly over the years, seize upon some arguably protected activity that preceded some allegedly adverse action, and set forth a claim based on the unsupported conclusion that one led to the other.").  No reasonable juror could conclude that Yassky's decision to impose a one-day suspension for Manon's outburst following the door-slamming incident was caused by Manon's protected activity.

Similarly, Manon had interacted with Pons and experienced his shuttle-driving prior to being transferred to the Enforcement unit in 2006, Manon Dep. at 55, 71; although the record is not clear as to when she began to complain about Pons, a September 2009 complaint indicated that "'once again' Mr. Eugene Pons was late for the shuttle," Anci Decl. Ex. K, suggesting that Manon had previously complained about Pons.  Assuming that Manon's plants were poisoned and that it was Pons who poisoned them (even though there is no actual evidence that he was the wrongdoer), that incident did not occur until nearly a year after Manon's first formal complaint against Pons in the record.  The door-slamming incident took place in November 2010 – approximately 14 months after Manon's first complaint.  *Cf. Fox v. New York City Dep't of Educ.*, No. 13-CV-3204(VEC), 2015 WL 4991878, at 11 n.11 (S.D.N.Y. Aug. 20, 2015) (collecting cases suggesting that 4 months is too long to draw a reasonable inference of causality

based on temporal proximity); *Fotopolous*, 11 F. Supp. 3d at 368 (one year was far too attenuated to support a causal inference resulting from temporal proximity).

In an effort to salvage her claim to temporal proximity, Manon notes that her complaints to PESH were filed on May 10, 2011, and July 16, 2012 (relating to air quality and fire exits in the first and a "dirty, filthy ladies bathroom" in the second).  Anci Decl. Exs. W, CC.  Manon argues that a mere two months after the first complaint, she was formally "charged with misconduct" based on her role in the door-slamming incident.  Pl. Opp. at 10.  But the TLC had been planning, or pursuing, the investigation regarding the door-slamming incident at least since November 12, 2010.  Manon Dep. at 94.  No reasonable juror could conclude that Manon's oft-repeated workplace complaints motivated the TLC to complete its on-going investigation or to refer charges against Manon.  Accordingly, Defendants are entitled to summary judgment on Manon's First Amendment claim.

### 4.   Defendants Would Have Taken the Same Actions if Manon Had Not Engaged in Protected Activity

Even if the Plaintiff had adduced a causal connection between her protected First Amendment activity and an adverse action against her, Defendants would be entitled to summary judgment on her First Amendment claim.  "Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event," *Smith*, 776 F.3d at 119 (quotation marks and citation omitted), an employer is entitled to summary judgment if it can establish "'by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct,'" *id.* (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Yassky's decision to suspend Manon for one day was supported by a well-reasoned opinion explaining that administrative precedents:

> draw the line at comments that are 'disrespectful, disruptive, or that employed profane, uncivil, or indecent language.' Transit Auth. v. Flowers, OATH Index No. 562/91. [Manon's] comments clearly crossed over that line . . . . The two OATH precedents Judge Spooner [(the ALJ who recommended no punishment)] notes, in which 'discourteous comments, following provocation by a coworker or supervisor, were excused, contrast starkly with a threat to take it outside and calling someone an 'animal.'

Anci Decl. Ex. GG (some internal citations omitted). Yassky conducted a thoughtful analysis, analogizing both to cases that had and had not resulted in punishment and concluding that Manon's case was more analogous to those that had. *Id.* This detailed and thoughtful showing is enough to demonstrate that Yassky would have punished Manon irrespective of Manon's facially unrelated complaints regarding her working conditions and Pons's shuttle driving.

Similarly, it is illogical to assert, and there is no evidence to suggest, that Manon's protected complaints (relating to workplace conditions, fire exits, and perhaps Pons's reckless driving) motivated Pons's "harassment." Manon has adduced evidence of *unprotected* complaints related to Pons's personal behavior that may have motivated his "retaliatory" conduct, *see* ALJ Opinion at 5, but the Court is concerned only with whether his conduct resulted from Manon's protected activity, and there is simply no evidence that it did.[13]

### B. Equal Protection

Next, Manon asserts an equal protection claim under a "selective enforcement" theory,[14] arguing that she was singled out for disparate treatment based on her exercise of First Amendment rights. TAC ¶¶ 101-06.[15] To prevail on a claim of selective enforcement, Plaintiff

---

[13] Because Manon's complaints were only tangentially related to matters of a public concern, if summary judgment were otherwise inappropriate, Defendants would be entitled to qualified immunity on the basis that Manon's complaints were not "clearly established" as protected conduct. *Cf. Pekowsky*, 23 F. Supp. 3d at 280-81.

[14] Although Manon's complaint could be compatible with multiple theories of equal protection liability, her brief clarifies that she is proceeding on a selective enforcement theory. Pl. Opp. at 17-18.

[15] Defendants appear to have mistaken this claim for a cause of action based on disparate treatment due to race or sex. Defs. Mem. at 17-19. Manon responds by noting a number of sexist comments allegedly made by some of the Defendants. Pl. Opp. at 18. None of that discussion affects the Court's analysis.

must show "both (1) that [she] was treated differently from other similarly situated [individual]s and (2) that 'such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *see also Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995). Manon fails on both prongs.

Manon advances two examples of situations in which she was allegedly treated differently from similarly situated individuals; neither is persuasive. First, she alleges that similarly-situated employees who did not complain about fire exits and reckless shuttle driving would not have been suspended "for an excited, non-expletive utterance made in the throes of pain." TAC ¶ 104. The only comparator that Manon identifies is Pons, who was suspended 10 days for conduct that was worse than her utterance. Manon alleges that Pons has escaped liability for assaulting her and that he received a "relatively light penalty" for his role in the door incident. Pl. Opp. at 18. Although "'[g]enerally, whether two entities are similarly situated is a factual issue that should be submitted to the jury[,]' . . . the rule is not absolute." *Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686(MKB), 2015 WL 1475853, at *7 (E.D.N.Y. Mar. 31, 2015) (quoting *Cine SK8*, 507 F.3d at 790-91). When a plaintiff "fails to allege that any other [individuals] were similarly situated in all material respects, let alone establish a high degree of similarity under the more stringent class of one standard," she cannot prevail on an equal protection claim. *Witt v. Vill. of Mamaroneck*, No. 12-CV-8778(ER), 2015 WL 1427206, at *6 (S.D.N.Y. Mar. 27, 2015).[16] Pons was not "similarly situated" to Manon in *any* respect,

---

[16] This Court need not weigh in on the "'disagreement within the Second Circuit regarding the degree of similarity that a plaintiff must show in order adequately to allege an equal protection claim under the selective enforcement theory.'" *Tower Props. LLC v. Vill. of Highland Falls*, No. 14-CV-4592(NSR), 2015 WL 4124499, at *8 (S.D.N.Y. July 7, 2015) (quoting *Witt*, 2015 WL 1427206, at *5). The Court's conclusion would be the same under either theory.

however, and Manon has not carried "the initial burden of demonstrating sufficient similarity."
*Bernstein v. Vill. of Wesley Hills*, --- F. Supp. 3d ---, ---, No. 08-CV-156(KMK), 2015 WL
1399993, at *13 (S.D.N.Y. Mar. 27, 2015) (quotation marks and citation omitted).  Accordingly,
this is the rare case in which the Court can determine as a matter of law that no jury would
believe that the alleged comparator was "similarly situated" to the Plaintiff.  *Id.*[17]

Second, Manon alleges that she was treated differently from other non-complaining
employees because she was not promoted.  As to this claim, Manon fails to produce anyone who
was similarly situated who was promoted (a difficult proposition, to be sure, because Manon
turned down the opportunity to be promoted, Pl. 56.1 Opp. ¶ 4, Manon Dep. at 36, Cooper Dep.
at 12), and she adduces no evidence suggesting a link between the TLC's failure to promote her
and her protected activity.  *Cf. Troy v. City of New York*, No. 13-CV-5082(AJN), 2014 WL
4804479, at *11 (S.D.N.Y. Sept. 25, 2014).  Defendants are entitled to summary judgment as to
Manon's equal protection claim.

### C.  Federal Conspiracy Claims

Defendants next challenge Manon's claims pursuant to 42 U.S.C. §§ 1985(3), 1986, and
1988.  "A conspiracy claim under Section 1985(3) requires a plaintiff to allege '1) a conspiracy;
2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the
equal protections of the laws, or of equal privileges and immunities under the laws; and 3) an act
in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property
or deprived of any right or privilege of a citizen of the United States.'"  *Dolan v. Connolly*, 794
F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)).

---

[17]     Moreover, Manon has adduced no evidence from which the Court could conclude that – even if Pons *were*
similarly situated – the reason that he was not punished more harshly was because he did not complain about the
driving of the shuttle or the conditions of the Woodside TLC facility.

Moreover, such a "conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.'"  *Id.* (quoting *Cine SK8*, 507 F.3d at 791).

Manon has adduced *no* evidence to suggest that there was a conspiracy to violate her rights as a result of her membership in a protected class.  Manon identifies three sexist comments allegedly made by TLC employees over a period of seven or eight years.[18]  None of these "stray remarks" can support Manon's claim that she was the victim of a conspiracy that was motivated by invidious discriminatory animus.  *White v. City of New York*, No. 13-CV-7156(ER), 2014 WL 4357466, at *16 (S.D.N.Y. Sept. 3, 2014); *Wojcik v. Brandiss*, 973 F. Supp. 2d 195, 212 (E.D.N.Y. 2013) ("'The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'") (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in unrelated part by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) (alteration omitted)).  The fact that Manon was a Latina woman in a male-dominated agency, Pl. Opp. at 19, is insufficient to support her claim that Defendants conspired to violate her rights.  Without her Section 1985 claim, Manon's Section 1986 claim fails as well.  *See Reynolds v. Barrett*, 685 F.3d 193, 201 n.9 (2d Cir. 2012); 42 U.S.C. § 1986.  Accordingly, Defendants are entitled to summary judgment as to Manon's sixth and seventh causes of action.

### D.  Substantive Due Process

Manon also asserts a cause of action for violation of her substantive due process rights.  TAC ¶¶ 107-19.  Defendants did not address this claim in their brief-in-chief but seek to move against it in their reply brief.  Although in some cases courts have held that arguments in a reply

---

[18]   At some point prior to 2005, a colleague "made a comment about woman [sic] belonging at home barefoot and having babies," Manon Dep. at 49, Milner Decl. Ex. E.  In 2009 or 2010, Pons "made several comments to another male co-worker that women do not belong in the workplace, they should stay home and make babies," *id.* at 83.  Finally, in 2007, when Manon complained about the temperature, she was asked whether she was menopausal, Pl. Mem. at 19 (interpreting Anci Decl. Ex. I).

brief were "subsumed" within larger arguments in moving briefs, *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005), the more standard rule is that "'arguments may not be made for the first time in a reply brief,'" *Simpson v. City of New York*, 793 F.3d 259, 264 (2d Cir. 2015) (quoting *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) (alteration omitted)).  This rule applies with equal force in the District Court.  *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, --- F. Supp. 3d ---, ---, No. 14-MD-2589(JMF), 2015 WL 5052538, at *18 (S.D.N.Y. Aug. 26, 2015); *Cruz v. Zucker*, --- F. Supp. 3d ---, ---, No. 14-CV-4456(JSR), 2015 WL 4548162, at *13 n.10 (S.D.N.Y. July 29, 2015) ("Because these arguments were not raised in [Defendants'] opening brief, they were waived, and the Court does not address them.").  Accordingly, although the Court is skeptical that the Plaintiff has a viable claim, Defendants are not entitled to summary judgment as to Manon's fifth cause of action for violations of her substantive due process rights.

### E.  Municipal Liability

Manon seeks to hold the City of New York liable for all of the alleged constitutional violations.  TAC ¶¶ 75-83.  When a municipality is sued for discrimination under §§ 1981 or 1983 "'the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom.'"  *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quoting *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004)); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  The only relevant policy that Manon has identified is a workplace violence policy that requires TLC employees to report incidents of violence – a policy that she alleges Defendants failed to follow in this case.  Pl. Opp. at 17.  Far from establishing that the municipal policy was the cause of any violation of her rights, Manon's version of events, in which Defendants failed to report Pons's violence towards her or to take appropriate action against him, suggests that it was Defendants' *deviation* from the policy that

24

resulted in the violation of her rights.  That cannot support a claim for municipal liability.  *See Newton v. City of New York*, 779 F.3d 140, 152 (2d Cir. 2015) ("To impose liability on a municipality under § 1983, a plaintiff must 'identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.'") (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997)).

A municipality can also be held liable for constitutional violations perpetrated "'by a person whose edicts or acts may fairly be said to represent official policy.'"  *Littlejohn*, 795 F.3d at 315 (quoting *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004)).  Manon argues that Yassky, as TLC Commissioner, had final decisionmaking authority as to employee discipline.  Pl. Opp. at 16.  The parties dispute whether Yassky constitutes a final decisionmaker for the purpose of this theory of liability.  Manon relies on the New York City Charter, which provides that the TLC Commissioner "shall have charge of the organization of [the TLC's] office and have authority to employ, assign and superintend the duties of such officers and employees as may be necessary."  65 N.Y.C. Charter § 2301(c).

To be a final decisionmaker for the purposes of municipal liability, an official "must 'possess final authority to establish municipal policy with respect to the action ordered.'"  *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (emphasis and alteration omitted)).  While Yassky had the final authority *within TLC* to determine personnel issues, Yassky Dep. at 6, he clearly did not have the "final authority to establish municipal policy" for questions like Manon's suspension – notably, he was overruled even as to his decision in this case, Anci Decl. Ex. HH.  The purpose of *Monell* liability is not to hold a municipality liable for decisions reached by agency heads; it is to hold the municipality liable for the decisions reached by the municipality itself.  Manon has not established a basis for municipal liability.

## II.     State Tort Law Claims

Defendants also move for summary judgment as to Manon's eight state law causes of action[19] on the sole basis that Manon did not file a notice of claim.  Manon's state law claims asserted against the Defendants in their official capacities are barred for failure to comply with New York's notice of claim requirements.  *See, e.g.*, *Barnes v. City of New York*, No. 13-CV-7283(GBD), 2015 WL 5052508, at *8 (S.D.N.Y. Aug. 26, 2015); *Brooks v. Cnty. of Nassau*, 54 F. Supp. 3d 254, 258 (E.D.N.Y. 2014) ("It is well settled that the failure to file a notice of claim bars state claims against individual defendants sued in their official capacities."); *Sandpebble Builders, Inc. v. Mansir*, 90 A.D.3d 888, 889 (2d Dep't 2011); *see also* N.Y. Gen. Mun. Law §§ 50-e, 50-i.

A notice of claim is not, however, a condition precedent to suing individual defendants in their individual capacities, "'unless the county is required to indemnify the individual defendants,'" *Brooks*, 54 F. Supp. 3d at 258 (quoting *Olsen v. Cnty. of Nassau*, 05-CV-3623(ETB), 2008 WL 4838705, at *4 (E.D.N.Y. Nov. 4, 2008), or the claims otherwise "relate to actions taken within the scope of [the officers'] official duties."  *Francis v. Posa*, 21 A.D.3d 1335, 1336 (4th Dep't 2005); *see also Cardiff v. Carrier*, 79 A.D.3d 1626, 1627 (4th Dep't 2010); *Sandpebble Builders*, 90 A.D.3d at 889 (affirming dismissal of a claim against an officer in her individual capacity for failure to file a notice of claim, "to the extent that [the claim] alleged that [she] was acting in the course and within the scope of her employment with the School District").  The parties have not briefed whether New York City would have a duty to indemnify Defendants for Manon's state law causes of action or whether the actions alleged were

---

[19]     Manon brings claims against Pons for battery, TAC ¶¶ 131-37; assault, *id.* ¶¶ 138-43; intentional infliction of emotional distress, *id.* ¶¶ 144-49; negligent infliction of emotional distress, *id.* ¶¶ 150-53; conversion, *id.* ¶¶ 154-59; and trespass to chattels, *id.* ¶¶ 160-66.  She also asserts claims of (1) vicarious liability for Pons's intentional torts and (2) negligent retention against Emert, Yassky, Mullings, and Scanlon.  *Id.* ¶¶ 167-76.

undertaken within the scope of Defendants' employment (although the Court strains to imagine how a negligent retention claim, for example, would not fall within the scope of a defendant's employment).  *Id.* Accordingly, Defendants' motion for summary judgment is denied as to Manon's state law claims brought against Defendants in their individual capacities and granted insofar as the claims are brought against Defendants in their official capacities.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The Clerk of the Court is respectfully directed to terminate the case against the City of New York and to terminate docket entry 43.  The parties are directed to appear for a status conference on October 2, 2015, at 10:00 a.m., in Courtroom 443 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.

**SO ORDERED.**

**Date:  September 18, 2015**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**